[No. C000619. Third Dist. Dec. 12, 1989.]

RAYMOND J. LEONARDINI, Plaintiff and Respondent, v. SHELL OIL COMPANY, Defendant and Appellant.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III and IV.

552

COUNSEL

Sedgwick, Detert, Moran & Arnold, Stephen W. Jones and Frederick D. Baker for Defendant and Appellant.

Friedman, Collard & Poswall and John M. Poswall for Plaintiff and Respondent.

OPINION

SPARKS, J.—In this malicious prosecution action we are called upon to resolve the clash between the claimed right to enjoin a trade libel and the constitutional right of free speech. The case had its genesis in an earlier but unsuccessful attempt to obtain an injunction against the publication of a report concerning the safety of plastic pipes for domestic water use. The published report was first filed in the record of the governmental agency conducting hearings on the question and was then later disseminated elsewhere. We resolve the conflict in favor of free speech.

The central question is whether the defendant, a manufacturer of pipe resin, had probable cause to file an earlier action against the plaintiff, an attorney for a pipe trade council. The underlying dispute between the parties arose out of documents relating to the safety of the proposed expanded use of plastic pipes for plumbing purposes. The prior action sought to enjoin an alleged trade libel that defendant's product contained a carcinogen and to obtain a declaratory judgment that its product does not represent a danger to human health. The issue turns on whether, given the facts known

to defendant, the prior action was legally tenable as a matter of law. We hold it was not because the constitutional guaranties of free speech prohibit a court from enjoining the dissemination of documents and information which formed part of the public debate on a matter of public health and safety.[1]

Defendant Shell Oil Company (Shell) appeals from a judgment entered on a jury verdict in favor of plaintiff Raymond J. Leonardini awarding him compensatory damages in the amount of $197,000, and punitive damages in the amount of $5 million. Shell raises a number of objections to the judgment. It first argues that the trial court erred by directing a verdict against it on the probable cause issue and this error mandates reversal. Shell next claims that the court's instruction on probable cause misstated the law and was prejudicial. Its third contention is that the trial court committed reversible error in admitting expert legal testimony on probable cause. The fourth contention is that it was reversible error to admit evidence on the toxicity of certain fittings. The last two contentions relate to damages. Shell asserts that the compensatory damage award was both grossly excessive and unsupported by the evidence. Finally, it argues that the $5 million punitive damage award was excessive as a matter of law. We resolve the probable cause issue in favor of plaintiff in the published portion of this opinion. In the unpublished part we consider the remaining contentions. Finding no reversible error there we shall affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

This case began in a high stakes, public clash over the use of polybutylene pipe in this state for drinking water. Shell sought approval of the unrestricted use of the pipe without any environmental impact report. Plaintiff advocated that the public officials charged with the responsibility for health and safety independently test the pipe system before exposing Californians to potential health risks. How that struggle was waged is the story of this lawsuit.

Plaintiff is an attorney. After becoming a member of the State Bar of California, he worked for a number of years in the Department of Consum-

---

[1] The First Amendment to the United States Constitution prescribes that "Congress shall make no law . . . abridging the freedom of speech, . . ." The California Constitution contains a similar guaranty: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Cal. Const., art. I, § 2, subd. (a).) For convenience we use the term "First Amendment" in this opinion to refer not only to that provision of the United States Constitution but also to article I, section 2 of the California Constitution. (See *Blatty* v. *New York Times Co.* (1986) 42 Cal.3d 1033, 1049, fn.4 [232 Cal.Rptr. 542, 728 P.2d 1177].)

er Affairs. Ultimately, he attained the position of assistant cabinet secretary of the state Department of Consumer Affairs. Eventually plaintiff left government service to start a private practice in Sacramento. During all relevant periods plaintiff had one primary client, the California Pipe Trades Council (Council). The Council is an organization of plumbers' and pipe fitters' unions. Representatives of the Council advised plaintiff that hearings were scheduled to commence concerning the unrestricted use of plastic pipe for plumbing, including drinking water. Among other things, plaintiff was retained by the Council to represent it in connection with those plastic pipe proposals. Plaintiff then undertook to familiarize himself with the health and safety issues affecting plumbers and pipe fitters. He asserted that his primary concern centered on health and safety issues, although he conceded that increased competition from plastic pipes could be an economic issue with plumbers and pipe fitters. As part of his preparation, plaintiff assembled information about the health problems related to the installation and use of plastic pipes.

During 1979 and 1980 the Commission on Housing and Community Development (Commission) was considering the expanded use of plastic piping for potable (drinking) water purposes. The Commission held public hearings, invited public comment and debate and maintained a public record of all the material submitted to it on the question. In addition to written comments, the Commission also took testimony from officials of public agencies and others interested in or concerned with the use of plastic pipes. The Commission also retained its own scientific consultant, Dr. Marc Lappe, who was the head of the state hazard alert system. The essential question before the Commission was whether the state of scientific information was such that plastic pipe could safely be approved for carrying drinking water or whether independent testing was required. Shell and other manufacturers of plastic pipes and their components, as well as various representatives of trade associations, were active participants in these hearings. Shell and other supporters of the use of plastic pipes submitted various studies and scientific tests which they asserted showed that the pipe was safe and additional testing unnecessary.

The primary forms of plastic pipe at issue were PVC (polyvinyl chloride), CPVC (chlorinated polyvinyl chloride), and polybutylene. Plastic pipes are petrochemically based and most of the manufacturers of plastic piping are petrochemical companies. Shell apparently does not make plastic piping itself; it is, however, the only manufacturer of the resin which is the sole ingredient of polybutylene pipe. Polybutylene pipe differs from PVC and CPVC pipe in that it is flexible and does not use chemical solvents for installation. Instead, it requires heat fusion or fittings for installation.

During the Commission's review a study was commissioned at the James Montgomery Laboratory (Montgomery) to test PVC and CPVC piping for leaching of chemicals which could have potential health effects. Polybutylene was not the subject of the testing by that laboratory because the ingredients of the piping, as revealed by Shell, did not "ring an alarm" concerning possible health hazards. But Shell did not reveal to the state authorities that the polybutylene pipe system used an additional plastic, a polyacetal fitting with the trade name of Celcon, as a coupler. Mr. Steven Pregun, an organic chemist for Shell, in a letter to a customer, later described this coupling material as an "albatross" around the neck of the polybutylene pipe system. Shell's policy was that if the state did not discover any health problems with the system on its own and did not specifically ask for that information, Shell would not volunteer it.

The Montgomery study revealed that potentially hazardous chemicals could be leached into water from PVC and CPVC pipes. These chemicals were believed to be from the solvents used in installation and possibly from plasticizers added during manufacturing. These dangerous chemicals had never been disclosed to the State of California by the manufacturers of PVC or CPVC. Quite the contrary, they had represented to the state that the pipes were completely safe.

In the spring of 1980, Assemblyman Lou Papan of the California Legislature sponsored a concurrent resolution asking the Commission to halt approval of plastic pipes until such time as the toxic substance alert system had made findings of its own. In a response foreshadowing the suit against plaintiff, Shell told one of its representatives that "they have a battery of attorneys to handle people like that and that they'll turn it over to their legal department." Shell in fact responded by sending a letter to Assemblyman Papan threatening to take "appropriate legal action" against him if he did not desist from lumping polybutylene with other plastics.

As a result of the Montgomery study and other information, the Commission in November 1980, ordered the preparation of an environmental impact report (EIR) on the proposal for increased usage of PVC and CPVC pipes. It did not, however, require an EIR on the use of polybutylene pipe at that time. In the meantime plaintiff made an independent investigation to determine what studies, if any, had been done on PVC and CPVC. He contacted the National Sanitation Foundation and discovered their results were based upon tests made in 1955, dealt with inorganic chemicals and did not employ current technology. He personally visited both the federal Food and Drug Administration (FDA) and the Department of Environmental Protection and learned they had no information on the subject.

Following the Commission's determination, plaintiff arranged for California Analytical Laboratories, Inc. (CAL), an independent laboratory, to perform tests on polybutylene pipe. The tests were commissioned and paid for by the Council. Plaintiff testified that he had representatives of the Council deliver some polybutylene pipe to CAL. CAL then conducted tests on the pipe and on December 31, 1980, it prepared a report which was submitted to plaintiff.[2] The report reflected analyses of two pieces of pipe. With respect to one of the pieces the report indicated the presence of bis (2-ethylhexyl) phthalate (BEHP), more commonly known as di (ethylhexyl) phthalate (DEHP), at estimated levels of 50 to 500 parts per million (ppm). The possible presence of DEHP in polybutylene pipe could raise health concerns since it had recently been shown to be carcinogenic when fed to rodents in high doses (3,000 to 12,000 parts per million). Plaintiff sent the December 31, 1980, report to Dr. Lappe. Dr. Lappe forwarded the report to the Commission, noting that the results were disturbing in view of the animal carcinogenicity of DEHP and Shell's representation that plasticizers such as DEHP were not used in polybutylene. At some time the Commission determined to hold further hearings on the use of polybutylene pipe.

As we have noted, Shell does not manufacture polybutylene pipe; it manufactures polybutylene resin which is the sole ingredient of the pipe. Shell's evidence established that DEHP is not added to the resin in the manufacturing process. Shell sells the resin in pellet form to extruders who utilize an extrusion process to turn the pellets into pipe. Nothing is added to the resin in this process. In fact, the National Sanitation Foundation promulgated rules for extruders to follow in order to retain approval as extruders, and those rules forbid the addition of any substance to the resin in the extrusion process. In preparation for the Commission hearings Shell obtained affidavits from the extruders to whom it sells resin stating that they do not add DEHP to the resin during the extrusion process.

Following the disclosure of the CAL report, Shell hired Radian Corporation (Radian) to test polybutylene pipe leachates. Shell provided four leachate samples to Radian, and no DEHP was detected in those samples. In a follow-up analysis Radian obtained pipe samples, performed the leaching experiments itself using both water and hexane, and found no DEHP beyond what were described as background levels.[3]

---

[2] The Environmental Protection Agency (EPA) has protocols for testing of water leachates. CAL has followed the EPA protocols thousands of times in analyses. However, the preparatory steps for the December 31, 1980, study were unusual and were done by CAL for the first time.

[3] DEHP is used in a variety of products, such as Kleenex and toilet tissues, rubber gloves, rubber aprons, and cork stoppers. Shell's witness described it as ubiquitous to the environment, meaning that it can be found virtually anywhere. In one of its reports CAL agreed that DEHP is ubiquitous, and noted that two billion pounds are sold annually. For this reason it

In preparation for the Commission hearings plaintiff had CAL prepare a review of the first Radian study which offered some criticisms of Radian's report. Plaintiff forwarded the review to the Commission. He also had CAL perform additional testing. One test on Celcon polyacetal pipe fittings, which may be used with polybutylene pipe but which are not polybutylene, was positive for DEHP, and plaintiff forwarded the results to the Commission. Five additional tests were performed for plaintiff on polybutylene pipe and each test was negative for DEHP. Additionally, CAL performed an analysis for a toxicologist retained by a San Mateo local plumbers' union with negative results for DEHP.

In conjunction with the hearings, plaintiff prepared a booklet entitled "Health Hazards Associated With Plastic Pipe, A Status Report." The report was written with the intent of explaining the nature of the hearings and the issues which were involved. Plaintiff caused this booklet to be submitted into the public record of the hearings. Attached as an exhibit to the booklet was a copy of the CAL report, dated December 31, 1980. Plaintiff also included in the booklet a chapter on the use of polybutylene pipe for potable water. He suggested that because polybutylene is part of the generic plastic pipe grouping it may have stabilizers and plasticizers added to it. The report went on: "In early 1981, the California Department of Health Services evaluated research on polybutylene pipe that for the first time, was not authorized and *not* submitted by Shell Chemical Company. The results were alarming. . . . In particular, the tests conducted by the California Analytical Laboratories found 50-500 ppm of DEHP (a known animal carcinogen) in the *pipe itself.* Subsequent tests on other polybutylene pipe used for flexible connections to plumbing fixtures also found DEHP. [¶] The results were all the more disturbing because the representative of Shell Chemical Company had testified on the public record that polybutylene did not use DEHP. . . ." (Italics in original.) Plaintiff quoted Dr. Lappe's letter, written immediately after he received the December 31, 1980, CAL report, in which he indicated it was disturbing that the Commission had been given apparently misleading testimony by Shell concerning the ingredients of polybutylene pipe. With respect to the Radian tests, plaintiff stated that the tests were commissioned by Shell to counter the substantive findings of the CAL tests and, with reference to CAL's criticism of the Radian testing, he asserted the test was "so flawed as to be of little value."

---

is not uncommon for background levels of DEHP to be detected during chemical analysis. While there was some dispute whether small amounts of DEHP reflected in some studies were background levels or actually reflect small amounts of DEHP associated with the pipe, no test duplicated the relatively high concentrations of DEHP (50-500 ppm) reflected in the December 31, 1980, CAL test.

Plaintiff gave about 80 copies of the booklet to his client, the pipe trades council, for distribution. The Council "wanted to explain it to their members so they could understand the context of the controversy." He testified that he prepared the booklet and gave copies of it to the Council with the knowledge, and in fact with the intent, that it would be distributed to anyone who requested a copy. Nevertheless, he did not have any control or say over what the Council actually did with the copies of the booklet. He retained 12 copies in his office for distribution to anyone who desired one. Shell presented evidence that the booklet was the subject of widespread distribution by plaintiff and the Council.

On April 20, 1981, the Commission conducted a hearing to determine whether polybutylene pipe should be the subject of an EIR. At the hearing Dr. Lappe testified that he found the Radian test results reassuring that polybutylene pipe did not present a health risk due to DEHP. He followed his testimony with a letter to Commission confirming that view. Representatives of Shell appeared and opposed an EIR for polybutylene pipe. They suggested that a speedy resolution could be obtained by a set of additional tests to determine whether there really was a cancer-causing material in polybutylene pipes made from its resin. Plaintiff opposed this approach. Instead, he sought to have an EIR prepared. "I wanted polybutylene plumbing systems to be tested by an independent governmental agency whose responsibility was to certify the health and safety of this product before it was put into use by the public." As plaintiff later testified, "[G]iven the reality that we are talking about water, we are not talking about shoes or neckties or something like that, we're talking about an element basic to life, that it is incumbent upon the government to rely upon independent tests, not the manufacturers'. . . . [¶] And it was my belief, and the belief of a lot of people that before you approve it, make sure you've asked and answered and tested that product as thoroughly as you can before you approve it."

The public dispute escalated to statewide, even national, proportions. Contestants on both sides of the issue were quoted in national newspapers and magazines. Editorials appeared in various newspapers. Opinion pieces were published on both sides in newspapers. Public officials joined in the debate and called for testing. Shell itself sent a letter to interested parties across the country telling them that the information about the polybutylene controversy "is part of the public record and is available to anyone who wishes to write us." Shell described the controversy as a "big lie" paid for by the plumbers.

But Shell, according to one of its disgruntled consultants to the polybutylene division, found that plaintiff "was being too effectual at hearings.

And if he continued on the road that he was pursuing, he was going to wind up getting polybutylene pipe in that same E.I.R. that he was suggesting needed to be concentrated for PVC and solvent leaching problem with CPVC and PVC." Such an outcome, in Shell's view, would be a "total disaster." Shell's management became "very emphatic about doing whatever was necessary to see if they could eliminate [plaintiff] and his tenaciousness from the hearings." Plaintiff "was just really creating a hornet's nest and something needed to be done with him, . . ." That something, as we shall see, was the filing of a lawsuit in the federal court. In retrospect, Shell had correctly foreseen the difficulties because the Commission ultimately rejected its approach and ordered the preparation of an EIR on polybutylene pipe.

In 1981 additional, independent testing of polybutylene was conducted. The East Bay Municipal Utility District became concerned over reports of carcinogens in polybutylene pipe and conducted tests which were negative for DEHP. The United States Navy put a Florida base on bottled water while it tested its polybutylene piping system. The tests were negative for DEHP. Radian obtained pipe from the same lot as the pipe which had been tested by CAL in December 1980. Radian tested the pipe and sent pieces to four independent laboratories for testing. The results were negative for DEHP beyond background levels.[4]

According to the testimony of Dr. Richard F. Schimbor, the former manager of Shell's polybutylene business, during the spring and summer of 1981 Shell began to receive reports of consumer fear over the reports that its product contained carcinogens. A number of polybutylene pipe extruders were reporting a substantial impact on their business. Additionally Shell obtained information that plaintiff was actively distributing the CAL report of December 31, 1980, as alleged proof that polybutylene pipe in fact contained substantial levels of DEHP. Among other things he sent the report to the Commission and also distributed or caused it to be distributed at a meeting of the International Association of Plumbing and Mechanical Officials, spoke with reporters, distributed his booklet from his office, and wrote to various local officials referring to "substantial evidence that polybutylene pipe contains toxic and carcinogenic chemicals."

In June 1981, Shell sent a mailgram to CAL and advised it that its report was being circulated in support of a claim that polybutylene pipe contained DEHP at dangerous levels. Shell sought to meet with representatives from

---

[4] Radian detected DEHP at levels less than one ppm, West Coast Technical Service detected DEHP of three ppm and less than one ppm in its blank, Systems Science and Software detected DEHP at two ppm, TRW reported less than one ppm in both the leachate and the blank, and Acurex Corporation reported no DEHP detected.

CAL to discuss its report. CAL replied that it would not discuss the report with anyone but its client, and that if the report were being circulated Shell should discuss it with plaintiff. One of Shell's attorneys spoke with Dr. Lappe. According to Dr. Lappe: "Mr. Holliman called and spoke to me, I thought very candidly and personally, and said, Look there is some additional trouble that is brewing about this D.E.H.P. issue. [¶] He expressed some gratification about the way I was handling the issue at that time. And then said, however, there are some boys in Houston—that was his phrase— who were playing hardball, and that also was his phrase, and that they are very concerned about people, specifically Mr. Leonardini, who are going on and describing D.E.H.P. as a health threat or publicly disclosing or discussing D.E.H.P. in what Mr. Holliman felt to be greatly exaggerated terms. [¶] And that it was beginning to hurt Shell economically to have these discussions and that something was going to have to be done to dampen or quiet these kinds of outspoken statements." Holliman also mentioned that there was talk about bringing a lawsuit.

In August 1981, Shell filed a complaint in the United States District Court for the Eastern District of California invoking the court's jurisdiction on grounds of diversity of citizenship. (28 U.S.C. § 1332.) The complaint sought to enjoin trade libel and to obtain declaratory relief against CAL and plaintiff. Shell made the following allegations in its complaint: It is the sole manufacturer of polybutylene resin which is processed into finished pipe. In November 1980, the Commission approved the use of polybutylene pipe as a conduit for potable water. In December 1980, CAL conducted tests and reported that polybutylene contained 50 to 500 ppm DEHP. Tests prior to the CAL tests had shown that DEHP can cause cancer in laboratory animals and at the levels reported by CAL the presence of DEHP in pipe could represent a danger to human health according to some studies. CAL reported its conclusions to plaintiff who thereafter willfully, intentionally, without justification or privilege, and in reckless disregard of the truth, published, communicated, and caused to be published and communicated the CAL report and material findings thereof. The report was false as neither polybutylene resin nor the pipe tested contains DEHP. CAL and plaintiff had been informed that independent laboratory analysis had concluded that DEHP was not present in polybutylene pipe and was found, if at all, only in pipe leachate at levels associated with laboratory background environments and at levels not dangerous to human health. Defendant had asked CAL to retest polybutylene pipe but CAL had either refused to test or had failed to report results. CAL had twice been asked to retract its conclusions. CAL and plaintiff knew or reasonably should have known that third persons to whom they communicated their claims would rely upon it. CAL and plaintiff have disparaged and continue to disparage defendant's product by disseminating and publishing the report that polybutylene pipe made from

defendant's resin contains DEHP. As a result prospective customers have been and will be deterred from buying polybutylene pipe and resin.

Shell sought an injunction to restrain CAL and plaintiff from further publishing and communicating CAL's results and conclusions regarding the presence of DEHP in polybutylene pipe. Shell also sought a declaratory judgment declaring that polybutylene resin and pipe does not contain DEHP in levels sufficient to present a danger to human health, at 50 to 500 ppm, or at all.

Leonardini filed an answer to the complaint and then hired independent counsel to represent him. Although he feared he would be deluged with such things as paperwork, interrogatories, depositions, and inspections of his records, Leonardini was never subjected to discovery or other processes. During the fall of 1981 Shell was negotiating a settlement with CAL. In early 1982 Leonardini's attorney wrote to Shell's counsel to request a dismissal. Counsel replied that he expected to settle with CAL and would probably then dismiss as to Leonardini. Shell eventually entered into a settlement with CAL. Shell and CAL signed a mutual release and agreed to a joint statement. The joint statement stated that the December 31, 1980, report was intended only as a survey for the gross presence of substances in the particular samples tested and was not intended to reflect exact amounts of particular substances in the samples or in polybutylene pipe in general. CAL acknowledged that its findings were the result of testing of one sample and recommended that further testing be conducted before definitive conclusions were drawn. CAL stated that it has no opinion whether polybutylene pipe presents a hazard to human health and no opinion whether DEHP exists in polybutylene pipe in general. Shell stated that it has no reason to believe that CAL is other than a responsible, independent laboratory.

Leonardini then filed a motion to dismiss the complaint. He argued there that Shell's claim for injunctive relief failed to state a claim because an injunction would constitute an unconstitutional prior restraint on freedom of speech and because the statements in question were absolutely privileged. He further argued that the claim for declaratory relief similarly failed because there was no case or controversy alleged and because declaratory relief was inappropriate where the issue was already the subject of administrative proceedings. Shell filed opposition to the motion, but then filed its own motion to dismiss the action as to Leonardini. That motion was granted on May 10, 1982. On April 15, 1983, Leonardini filed this action for malicious prosecution.

As we have recounted, the jury found in favor of Leonardini. It awarded him damages of $22,000 for attorney fees incurred in the federal action,

$175,000 general damages, and $5 million punitive damages. Shell's motion for new trial was denied and this appeal followed.

DISCUSSION

I

Probable Cause to File Federal Lawsuit

Plaintiff's theory of this case is that Shell filed its federal lawsuit against him for an improper purpose and with an ulterior motive. Plaintiff asserts that Shell wished polybutylene pipe to be approved without public scrutiny of its health consequences and to that end filed the suit to muzzle his advocacy, or to prevent him from stumbling onto the trioxane problems involved with polyacetal fittings. To further this malicious aim, Shell filed the federal action without probable cause.

It is in this context that Shell argues that the trial court, as a result of its misapprehension of the law of probable cause in a malicious prosecution action, erroneously directed a verdict against it on this issue. In doing so, according to Shell, the court ignored established law which mandates that the jury determine the facts underlying probable cause before the court decides the legal issue. As Shell sees it, numerous factual conflicts existed about the accuracy, truth, distribution and privileged nature of plaintiff's statements which should have been resolved by the jury. Moreover, even if there were no factual conflicts, the court still erred in directing a verdict on probable cause because there was a reasonable basis to bring the trade libel action. In Shell's view, plaintiff committed a trade libel against it for which injunctive relief was an appropriate remedy. Finally, it claims that its declaratory relief cause of action was also brought properly. We begin with the determination of probable cause.

A. *Probable Cause Determination*

Following the presentation of evidence the trial court granted plaintiff's motion for a directed verdict on the issue of probable cause to bring the federal action.[5] The court instructed the jury that plaintiff was required to prove that Shell acted without probable cause and with malice in initiating

---

[5] Code of Civil Procedure section 630 authorizes the making of a motion for directed verdict after all the parties have completed the presentation of all their evidence. The statute further provides that "[i]f it appears that the evidence presented supports the granting of the motion as to some, but not all, of the issues involved in the action, the court shall grant the motion as to those issues and the action shall proceed on any remaining issues." (Code Civ. Proc., § 630, subd. (b).)

the federal court action. On the question of probable cause the court instructed: "To constitute probable cause for the initiation or maintenance of the Federal civil suit against the plaintiff in this case, the evidence must establish: [¶] One, Shell . . . had an actual, honest, and good faith belief in that action it brought. [¶] Two, that such belief if held by Shell . . . was a reasonable belief based upon the facts and the law. [¶] In its Federal suit against [plaintiff], Shell . . . sought an injunction to prevent further dissemination of the California Analytical Laboratory report dated December 30, 1980, which report had been entered into the public record of the State of California and involved a matter of public debate and controversy. [¶] Shell['s] . . . suit further sought a declaration by the court concerning the presence or absence of D.E.H.P. in its resin or in pipe made by others from its resin. [¶] The law of the State of California and of the United States does not permit any court to issue an injunction to prevent the dissemination of such a report under the circumstances shown by the evidence in this case. [¶] Further, the declaratory relief sought or claimed as a basis for Shell's Federal suit could not legally be used for a finding of a scientific fact by a court in the manner in which Shell's action sought the use of such relief. [¶] Accordingly, you are instructed that this Court finds, as a matter of law, that there was no probable cause for the bringing of the Federal suit brought by Shell . . . against [plaintiff]."

Following the probable cause instruction the court instructed on the issue of malice: "The words malice and malicious mean a wish to vex, annoy, or injure another person. [¶] Malice means the attitude or state of mind which actuates the doing of an act for some improper or wrongful motive or purpose. [¶] Malice, like any other fact, may be proved by direct or circumstantial evidence. [¶] This Court having found that [Shell] lacked probable cause for initiating the Federal proceeding against plaintiff . . . , you may infer that Shell . . . acted with malice."

■ In a malicious prosecution action the plaintiff must prove that the prior action (1) was commenced by or at the defendant's direction and terminated in plaintiff's favor; (2) was brought without probable cause; and (3) was initiated with malice. (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 50 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].)[6]

---

[6] There is a division of authority among various jurisdictions on the question of whether the malicious prosecution plaintiff is required to prove special damages or may seek general damages. (See 1 Harper et al., The Law of Torts (2d ed. 1986) § 4.8, pp. 457-477.) In jurisdictions which require proof of special damages it is generally held that an action for injunctive relief, in which no preliminary injunction or temporary restraining order is actually obtained, cannot give rise to a malicious prosecution action. (See Annot., Proceedings for Injunction or Restraining Order as a Basis of Malicious Prosecution Action (1976) 70 A.L.R.3d 536.) In this state general damages may be claimed in a malicious prosecution action. (*Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 59.)

■ Malicious prosecution is a disfavored action. (*Babb* v. *Superior Court* (1971) 3 Cal.3d 841, 847 [92 Cal.Rptr. 179, 479 P.2d 379]; *Cooper* v. *Pirelli Cable Corp.* (1984) 160 Cal.App.3d 294, 298 [206 Cal.Rptr. 581]. See also *Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 53.) This is due to the principles that favor open access to the courts for the redress of grievances. In fact, it has been held that access to the courts is a constitutional right founded upon the First Amendment to the United States Constitution. (*California Transport* v. *Trucking Unlimited* (1972) 404 U.S. 508, 510-511 [30 L.Ed.2d 642, 646, 92 S.Ct. 609]; *Taylor Drug Stores* v. *Associated Dry Goods* (6th Cir. 1977) 560 F.2d 211, 213; *Pennwalt Corp.* v. *Zenith Laboratories, Inc.* (E.D. Mich. 1979) 472 F.Supp. 413, 424.) But regardless of any constitutional basis for the policy, it is beyond dispute that the strong public policy of this state favors open access to the courts for the resolution of conflicts. (*Grindle* v. *Lorbeer* (1987) 196 Cal.App.3d 1461, 1467 [242 Cal.Rptr. 562]; *Norton* v. *Hines* (1975) 49 Cal.App.3d 917, 922 [123 Cal.Rptr. 237].) "The courts of the state are open to every citizen for the redress of his wrongs, and unless he is at liberty to seek such redress without rendering himself liable in damages to the defendant, in case he shall fail to establish his complaint, this right would in many instances be a barren privilege." (*Asevado* v. *Orr* (1893) 100 Cal. 293, 297 [34 P. 777].) Accordingly, litigants have the right to present issues that are arguably correct even if it is extremely unlikely they will win. (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179]; see also *Williams* v. *Coombs* (1986) 179 Cal.App.3d 626, 640 [224 Cal.Rptr. 865].) In view of these considerations the California Supreme Court has recently refused to abandon or relax traditional limitations on malicious prosecution recovery. (*Sheldon Appel Co.* v. *Albert & Oliker* (1989) 47 Cal.3d 863, 863-874 [254 Cal.Rptr. 336, 765 P.2d 498].)

■ The disfavored nature of the tort of malicious prosecution does not mean that a litigant should be deprived of a legitimate cause of action through arbitrary limitations. (*Jaffe* v. *Stone* (1941) 18 Cal.2d 146, 159-160 [114 P.2d 335, 135 A.L.R. 775].) The public policy involved has served to place strict limitations on the elements of the tort and to require judicial determination of whether the prior action lacked probable cause. (*Id.* at p. 159; *Cooper* v. *Pirelli Cable Corp., supra,* 160 Cal.App.3d at p. 298; *Norton* v. *Hines, supra,* 49 Cal.App.3d at pp. 922-923.) The public policy is served by adherence to the strict requirement that the plaintiff prove each of the necessary elements of the tort and by careful consideration of the probable cause issue by the court so that recovery is not permitted for mere negligence in bringing an action (*ibid.*), or simply because the action was not successful (*Vesper* v. *Crane Co.* (1913) 165 Cal. 36, 41 [130 P. 876]). But when a plaintiff can prove each of the essential elements of malicious prosecution, then the assertion that the tort is disfavored will not bar relief. (*Jaffe*

v. *Stone, supra,* 18 Cal.2d at p. 159. See also *Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 53.)

 Plaintiff expended much effort in the trial court and on appeal attempting to define the issues as he perceived them. He asserts that the case is not about DEHP or other chemicals. To the extent he considers chemicals to be in issue he focuses on polyacetal fittings and trioxane rather than DEHP in polybutylene pipe. "This case," he avers, "is not about chemicals. Nor is it about the dangers presented to the public by the unrestricted use of plastic pipe for drinking water. While such dangers are serious and form the backdrop against which this case was tried, the issues below are more fundamental to our society than the dangers posed to millions of Californians by toxic chemicals in their drinking water. [¶] The Shell Oil Company advocated, in California, the unrestricted use of a polybutylene pipe system for drinking water in homes without *any* testing whatsoever by public officials. Ray Leonardini advocated that the public bodies charged with the responsibility for health and safety independently test and examine the polybutylene pipe system before exposing millions of Californians to the unknown consequences of such use. In the midst of the ongoing public debate regarding the policies that California governmental bodies should follow, the Shell Oil Company sued its most effective political opponent and the independent and reputable laboratory that provided him technical and scientific assistance." He goes on to portray Shell as a huge and evil corporation attempting to foist a dangerous product on the public; Shell sued him because he was an obstacle to that purpose and could have stumbled onto the real problem (polyacetal). However, these claims are relevant only on the question of malice. The probable cause determination, which is an essential element of a cause of action for malicious prosecution, must be based upon the prior action which was in fact instituted by Shell. And the prior action was about, and was only about, plaintiff's dissemination of the claim that polybutylene pipe contains high levels of DEHP.

 The probable cause element of a malicious prosecution action requires an objective determination of the "reasonableness" of the defendant's prior lawsuit, i.e., whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable. (*Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at pp. 868, 886.) A lack of probable cause is an element separate from the requirement of malice. While a lack of probable cause may be inferential evidence of malice, the converse is not true; a lack of probable cause cannot be inferred from a showing of malice. (*Williams* v. *Coombs, supra,* 179 Cal.App.3d at p. 639, fn. 8.) "This is so because even 'though malice is inferred from want of probable cause, still where probable cause does exist, malice, even affirmatively shown, will not entitle the plaintiff to a verdict.'" (*Ibid.*, quoting from *Lacey* v. *Porter*

(1894) 103 Cal. 597, 607 [37 P. 635].) In other words, when the prior action was objectively reasonable the malicious prosecution defendant is entitled to prevail regardless of his subjective intent. "If the court determines that there was probable cause to institute the prior action, the malicious prosecution action fails, whether or not there is evidence that the prior suit was maliciously motivated." (*Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at p. 875.)

■ In considering the issue of probable cause there is an analytical dichotomy which arises due to the factual/legal duality involved in virtually all lawsuits. In a typical case the merits of the lawsuit depend upon the factual circumstances established by the evidence and the legal theory upon which relief is sought. A litigant will lack probable cause for his action if he relies upon facts which he has no reasonable cause to believe to be true, or seeks recovery upon a legal theory which is untenable under the facts known to him. The probable cause analysis may differ depending upon where the alleged deficiency lies. ■ Here, only the latter deficiency is implicated and thus the question is whether Shell had probable cause to file its federal lawsuit on the facts known to it.

■ In any lawsuit the courts must determine whether relief is legally available on the facts established. In a malicious prosecution action the legal aspect of probable cause requires a determination whether the prior claim for relief was legally tenable. (*Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at pp. 885-886.) Consideration of this question requires that the court take account of the evolutionary potential of legal principles and any uncertainty which might be embedded there. (*Ibid.*) "To hold that the person initiating civil proceedings is liable unless the claim proves to be valid, would throw an undesirable burden upon those who by advancing claims not heretofore recognized nevertheless aid in making the law consistent with changing conditions and changing opinions. There are many instances in which a line of authority has been modified or rejected. To subject those who challenge this authority to liability for wrongful use of civil proceedings might prove a deterrent to the overturning of archaic decisions." (Rest.2d Torts, § 675, com. f, at p. 460. See also *Williams* v. *Coombs, supra,* 179 Cal.App.3d at p. 640.) In order to avoid chilling the assertion of novel or debatable legal claims the California Supreme Court has adopted, with appropriate modifications, the standard for determining whether an appeal is frivolous (*In re Marriage of Flaherty, supra,* 31 Cal.3d at p. 650), as the standard for determining probable cause in a malicious prosecution action. (*Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at pp. 885-886.) Under this standard a claim is not lacking in probable cause if any reasonable attorney would have thought the claim tenable. (*Ibid.* See

also *Murdock* v. *Gerth* (1944) 65 Cal.App.2d 170, 179 [150 P.2d 489] [applying a "fairly debatable" standard].)

In malicious prosecution actions the courts have seldom expressly recognized that the factual/legal aspects of the prior suit require a factual/legal analysis of the probable cause issue. Instead the factual/legal dichotomy implicit in prior actions has found expression in an inappropriate "objective subjective" view of probable cause. This in turn has led to confusion over the proper roles of the court and jury in the probable cause determination. Specifically, some appellate decisions have indicated that probable cause is a mixed objective/subjective standard; the objective part to consider whether a reasonable person would have believed in the merits of the claim and the subjective part to focus upon whether the malicious prosecution defendant honestly believed in the merits of the claim. (See *Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 55; *Franzen* v. *Shenk* (1923) 192 Cal. 572, 576 [221 P. 932].) The subjective portion, involving as it would the defendant's state of mind, was regarded as a factual issue for the jury. (*Ibid.*)

In *Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d 863, the Supreme Court rejected the objective/subjective approach to a probable cause determination. Probable cause is to be determined in all instances by an objective standard, that is, whether the prior action was objectively reasonable.[7] If it was objectively reasonable then the defendant is entitled to judgment in the malicious prosecution action regardless of what his subjective belief or intent may have been. (*Id.* at pp. 878-879.) ■ Of course, there may be factual questions which require resolution before the objective standard can be applied. For instance, there may be evidentiary disputes over the information and facts known to the defendant when it brought the prior action or it may be claimed the defendant was aware of information that established the lack of truth in his factual allegations. In such circumstances the threshold question of the state of the defendant's knowledge of the facts

---

[7] In *Sheldon Appel Co.*, the Supreme Court was considering a malicious prosecution action brought against the attorneys who filed the prior action rather than their client, the actual plaintiff in the action. The standard for the plaintiff client may be somewhat different. In *Anderson* v. *Coleman* (1880) 56 Cal. 124 at pages 126 and 127, a concurring justice suggested that a plaintiff can never be held liable for malicious prosecution if he hired an attorney to file the action and had cause to believe the facts relied upon. This suggestion has not been accepted, however. Rather, it has been held that actual and good faith reliance upon the advice of counsel is a complete defense only if full disclosure of the facts was made. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 449, pp. 533-534.) In this case Shell did not rely upon the advice of counsel as a defense, but no reason appears to hold it to a more stringent standard than an attorney would be held to in evaluating the legal tenability of the prior suit. In fact, in *Sheldon Appel Co.*, the court adopted the legal tenability standard to afford litigants and their attorneys protection from subsequent tort liability. Accordingly, we believe the legal tenability standard is the appropriate measure of probable cause to apply to the plaintiff in the former action who does not rely upon advice of counsel as a defense.

must be resolved by the jury before application of the objective probable cause standard. But when the state of the defendant's knowledge of the facts has been determined or is undisputed then his subjective belief in the legal validity of his claim is irrelevant and the only question is whether, based upon his knowledge, his action was objectively reasonable. (*Id.* at p. 881.) That determination is always to be made by the court and not by the jury. (*Ibid.*)

■ Shell contends that there are many factual conflicts regarding whether plaintiff committed a trade libel by the publication of the CAL report. For instance, does polybutylene pipe contain DEHP, did the CAL report reflect a scientifically valid test, did the report disparage Shell's product, did plaintiff distribute the report knowing it to be false and if so, to what extent did he distribute it? Shell argues that the jury and not the court should have resolved these factual conflicts. This contention misses the probable cause point. The only relevant factual question was the state of Shell's knowledge at the time it filed the federal lawsuit. "When there is a dispute as to the state of the defendant's knowledge and the existence of probable cause turns on resolution of that dispute, *Franzen, supra*, 192 Cal. 572, and similar cases hold that the jury must resolve the threshold question of the defendant's factual knowledge or belief. . . . As Chief Justice Taft's explanation of the probable cause element indicates, however, the jury's factual inquiry into the defendant's belief or knowledge is not properly an inquiry into 'whether [the defendant] thought the facts to constitute probable cause'; when the state of the defendant's factual knowledge is resolved or undisputed, it is the court which decides whether such facts constitute probable cause or not." (*Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at p. 881, citations omitted.) In this case the state of Shell's factual knowledge was undisputed. Consequently, the probable cause analysis was limited to the legal question. Under these circumstances, "the probable cause issue is properly determined by the trial court under an objective standard; . . ." (*Ibid.*)

■ Shell next argues that even if the judge properly decided the question of probable cause, his instruction to the jury misstated the law and was both argumentative and prejudicial. Although the instruction was prolix, it did serve its function of informing the jury that the "Court finds, as a matter of law that there was no probable cause for the bringing of the Federal suit brought by the Shell Oil Company against Raymond J. Leonardini." Whether the instruction misstated the law and hence was prejudicial to Shell depends upon whether the trial court correctly concluded that Shell lacked probable cause to bring its federal lawsuit against plaintiff. It is to that issue that we next turn.

■ Before addressing the probable cause question it is necessary to note that we reject plaintiff's attempt to construe Shell's federal complaint with undue rigidity. Three sound but separate policies compel liberality in construction of the pleadings. First, we have already noted the policy which favors open access to the courts for the resolution of conflicts. This policy is inconsistent with a rigid construction of the prior pleadings to support a malicious prosecution action. Second, the law favors the early resolution of disputes, including voluntary dismissal of suits when the plaintiff becomes convinced he cannot prevail or otherwise chooses to forego the action. This policy would be ill served by a rule which would virtually compel the plaintiff to continue his litigation in order to place himself in the best posture for defense of a malicious prosecution action. (See *Asevado* v. *Orr, supra,* 100 Cal. at pp. 298-299.) Finally, and in any event, in this state pleadings are required to be liberally construed in favor of the pleader. (Code Civ. Proc., § 452; 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 396, pp. 446-447.) The factual allegations of the complaint are controlling over the title or label given the pleading and over the prayer or demand for relief. (*Id.* at § 405, p. 454.) In these respects federal rules of pleading are similar. (4 Witkin, *supra,* at §§ 333, 367, pp. 383-385, 420-421.) Together these policies compel the conclusion that Shell's federal complaint must be construed liberally in determining whether the action was legally tenable.

While we reject plaintiff's effort to construe the pleading with undue rigidity, we do not imply that a defendant can avoid liability for malicious prosecution by pointing to some undisclosed and unlitigated, but tenable, claim for relief. (*Williams* v. *Coombs, supra,* 179 Cal.App.3d at p. 644.) Probable cause for the initiation of an action depends upon the legal tenability of the action which was actually brought. (*Ibid.*) We hold only that in assessing the tenability of the action which was brought the complaint must be construed liberally in favor of the pleader rather than restrictively in favor of the malicious prosecution plaintiff.

■ In its federal court complaint Shell sought an injunction enjoining plaintiff "from further publishing and communicating CAL's test results and conclusions regarding the presence of DEHP in polybutylene pipe." It also sought a declaratory judgment that polybutylene resin and pipe "does not contain concentrations of DEHP at levels sufficient to represent a danger to human health, or at 50-500 parts per million, or at all." In Shell's view, the complaint as reasonably construed charges plaintiff with disparagement of Shell's product by falsely claiming it contains carcinogenic chemicals and thus it seeks to enjoin future disparagement and to obtain a declaration that plaintiff's conduct was tortious. It is these claims upon which the probable cause determination must be based.

We agree with plaintiff that Shell cannot avoid liability for malicious prosecution by asserting that plaintiff's conduct would have left him vulnerable to a trade libel suit for money damages. It is generally true that when a complaint seeks equitable relief which is unavailable the complaint will still state a cause of action if it shows a right to money damages. (4 Witkin, Cal. Procedure, Pleading, *supra,* pp. 63-65.) However, a cause of action for damages for trade libel requires pleading and proof of special damages in the form of pecuniary loss. (*Guess, Inc.* v. *Superior Court* (1986) 176 Cal.App.3d 473, 479 [222 Cal.Rptr. 79].) Shell neither pled, nor attempted to prove, specific pecuniary loss. Consequently, the determination whether Shell had probable cause for its action must focus upon its request for injunctive and declaratory relief rather than upon some unasserted claim for monetary damages.

B. *Probable Cause to Bring Action for Trade Libel*

■ The Restatement Second of Torts, has described the tort of "trade libel" as "[t]he particular form of injurious falsehood that involves disparagement of quality . . . ." (Rest.2d Torts, § 626, com. a, at p. 346.) It is there defined as "the publication of matter disparaging the quality of another's land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary loss to the other through the conduct of a third person in respect to the other's interests in the property." (Rest.2d Torts, § 626, p. 345.) California has adopted the Restatement formulation. (*Erlich* v. *Etner* (1964) 224 Cal.App.2d 69, 73 [36 Cal.Rptr. 256].) Trade libel has also been defined as encompassing all false statements concerning the quality of services or product of a business which are intended to cause that business financial harm and in fact do so. (Comment, *Development in the Law, Competitive Torts* (1964) 77 Harv.L.Rev. 888, 893.)

■ In the view of one reviewing court, trade libel "is a confusing concept that has not been subjected to rigorous judicial analysis in California." (*Polygram Records, Inc.* v. *Superior Court* (1985) 170 Cal.App.3d 543, 548 [216 Cal.Rptr. 252].) Be that as it may, it is nonetheless a well recognized tort in this state. (See, e.g., *Hoffman Co.* v. *E. I. Du Pont de Nemours & Co.* (1988) 202 Cal.App.3d 390, 397 [248 Cal.Rptr. 384]; *Guess, Inc.* v. *Superior Court, supra,* 176 Cal.App.3d at pp. 478-479; *Nichols* v. *Great American Ins. Companies* (1985) 169 Cal.App.3d 766, 773 [215 Cal.Rptr. 416]; *Erlich* v. *Etner, supra,* 224 Cal.App.2d at p. 73; 5 Witkin, Summary of Cal. Law, Torts, *supra,* pp. 661-671; 3 Levy et al., Cal. Torts (1989) § 40.70 et seq., pp. 40-121—40-127.) To constitute trade libel, a statement must be false, but need not be malicious except in the sense that it was not privileged. (See *Gudger* v. *Manton* (1943) 21 Cal.2d 537, 543 [134 P.2d 217],

disapproved on other grounds in *Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 381 [295 P.2d 405].)

 Although there is some misleading similarity, trade libel must be distinguished from the defamatory torts of libel and slander. "Thus, despite the fact that what has come to be known as 'trade libel' is similar to defamation in that both involve the imposition of liability for injuries sustained through publication to third parties of a false statement affecting the plaintiff, the two torts are distinct; that is, 'trade libel' is not true libel and is not actionable as defamation." (*Polygram Records, Inc.* v. *Superior Court, supra,* 170 Cal.App.3d at p. 549.) The basic difference between the two torts, it has been noted, is that an "action for defamation is designed to protect the *reputation* of the plaintiff, and the judgment vindicates that reputation, whereas the action for disparagement is based on *pecuniary damage* and lies only where such damage has been suffered." (5 Witkin, Summary of Cal. Law, Torts, *supra,* pp. 661-662, italics in original.)

 In its federal court action, Shell complained that plaintiff was disseminating the false claim that its polybutylene products contained DEHP at hazardous levels. Despite the jury's finding of malice in bringing the lawsuit, we think Shell had reason to believe plaintiff's claims were not true. It does not add DEHP to polybutylene resin, which is the sole ingredient of polybutylene pipe. Nothing is added to the resin in the extrusion process and in fact National Sanitation Foundation rules forbid the addition of any substance during the extrusion process. Shell obtained affidavits from its extruder customers stating that they do not add DEHP to polybutylene and in fact do not have DEHP in their extrusion plants. Moreover, Shell could reasonably believe that the CAL test was an anomaly. Numerous other scientific tests of which plaintiff and Shell were aware failed to identify DEHP associated with polybutylene pipe at other than background levels, if at all, and certainly not approaching the relatively high concentrations asserted by plaintiff.

Notwithstanding this assessment, Shell did not make out a claim for trade libel. First, Shell neither alleged nor sought pecuniary damages in its federal complaint attributable to Leonardini's dissemination of the CAL report or any of its contents. The claimed damages, according to the complaint, proximately resulted not from Leonardini's actions but rather from "CAL's publication of its report and its later refusal to reconsider it, . . ." Second, Shell alleged that plaintiff had disseminated the CAL report or its material findings "from on or about January, 1981 to the present," a period which encompassed the hearings before the Commission. The Commission was a public body created by the Legislature and charged with the duty of conducting hearings and making recommendations on the plastic pipes, the

subject of the CAL report. Accordingly, the allegations embrace communications which are arguably privileged and which could not form the basis of a trade libel. (Cf. *Block* v. *Sacramento Clinical Labs, Inc.* (1982) 131 Cal.App.3d 386 [182 Cal.Rptr. 438].) ■ Lastly, even if Shell might have had a claim for damages, that fact would not defeat a malicious prosecution action predicated upon the untenable claim for injunctive relief. ■ A malicious prosecution action "lies when but one of alternate theories of recovery is maliciously asserted . . . ." (*Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 57, fn. 5; see also *Balog* v. *LRJV, Inc.* (1988) 203 Cal.App.3d 1343, 1352-1357 [250 Cal.Rptr. 766].) ■ Thus, the probable cause question in this case is a more narrow one, and turns on whether injunctive and declaratory relief was available under the circumstances of this case.

■ One of the important differences between trade libel on the one hand and defamation on the other, is said to be that "because of the economic interest involved, the disparagement of quality may in a proper case be enjoined, whereas personal defamation can not [*sic*]." (Rest.2d Torts, § 626, com. b, p. 346.) ■ The crux of this appeal, therefore, is whether the trade libel action filed by Shell in the federal court was a proper case for injunctive relief. Shell claims that an injunction was available as a remedy for the alleged trade libel committed by plaintiff and that it had probable cause to seek that relief. In support of its position, Shell first cites to the quoted Restatement comment that a trade libel may be enjoined in a proper case. But it fails to note the Restatement's discussion of the constitutional constraints on the issuance of injunctions. "One of the public interests most frequently encountered in the determination of the appropriateness of injunction against tort is that in the freedom of speech and of the press. The public interest, long established in common-law policy, is today held to be embodied in the First Amendment and made applicable to the states by the Fourteenth Amendment. . . . [¶] These constitutional restrictions have in recent years materially affected certain substantive rules of the law of torts. . . . [¶] Since the decision of the Supreme Court in *Near* v. *Minnesota,* (1931) 283 U.S. 697, it has been recognized that there are constitutional restrictions that must be considered before an injunction may be granted against the exercise of speech. Prior restraint of certain types of communications runs afoul of the restrictions of the First Amendment, even though the enjoined conduct would be tortious in nature." (Rest.2d Torts, § 942, com. e, p. 588.)

In further support of its claim to entitlement of injunctive relief, Shell relies upon the statement in Witkin that "[a]n injunction may be granted to protect various kinds of interests in business and personal property. The following are important examples: . . . [¶] (i) Trade libel. (See 6 U.S.F.

L.Rev. 418.)" (6 Witkin, Cal. Procedure, Provisional Remedies, *supra,* pp. 226-227.) But the cited law review article, dealing with preliminary injunctions against trade libel, notes that the "courts use the traditional rule that equity will not enjoin a personal libel when ruling that a preliminary injunction against trade libel is unobtainable. As already noted, the main ground for refusing to grant the preliminary injunction is that the constitutional guarantees of freedom of the press and freedom of speech would be infringed." (Comment, The Availability of Preliminary Injunctions Against Trade Libel (1972) 6 U.S.F. L.Rev. 418, 419-420, fn. omitted.)

Shell's final support for its claim is placed on the cases of *Martin* v. *Reynolds Metals Company* (D.Ore. 1963) 224 F.Supp. 978, and *Black & Yates* v. *Mahogany Ass'n* (3d Cir. 1942) 129 F.2d 227 [148 A.L.R. 841]. But the first case manifests the same constitutional concern. In *Martin,* the owner of an alumina reduction plant sought a preliminary injunction requiring removal of a large billboard sign on a nearby ranch, proclaiming that poison from the plant killed cattle and endangered human health. Recognizing that the majority American rule is that equity will not enjoin a trade libel, the *Martin* court nonetheless concluded that an injunction may be proper in an appropriate case. In its view, "[i]n considering whether equity will enjoin trade libel (libel of a business or property interest), the better-reasoned opinions weigh two factors: [¶] 1) The adequacy or inadequacy of the remedy at law; and [¶] 2) The possible encroachment on free speech which might result from the injunction." (224 F.Supp. at p. 984.) Citing *Near* v. *Minnesota* (1931) 283 U.S. 697 [75 L.Ed. 2d 1357, 51 S.Ct. 625] the court conceded that equity will not enjoin a trade libel because "where the publication is about something which is of public interest, then the party libeled must turn to law for his relief." (224 F.Supp. at p. 985.) Concluding that the conduct at issue was not a matter of public interest because the sign was an outgrowth of a controversy between two private parties, dealt with only the interests of those parties and was erected to publicize the rancher's lawsuit against the plant owner, the *Martin* court ruled that an injunction was proper. (*Ibid.*) But implicit in the *Martin* court's formulation of the rule is that if the issue had been one of public interest, injunctive relief would not have been available. The second case relied upon by Shell, *Black & Yates* v. *Mahogany Ass'n, supra,* 129 F.2d 227, did not deal with any public interest questions and hence casts no light on the issue in this case. It merely held that an ordinary trade libel may be enjoined and does not purport to deal with the constitutional issues posed by this case.

This brings us to the crux of plaintiff's case. Plaintiff asserts that the prior action was without any basis because the primary relief sought, an injunction, would constitute a prior restraint against speech in violation of the free

speech clause of the First Amendment which, plaintiff maintains, is never permissible.[8]

■ It is now widely recognized that "[c]onstitutional defenses based on the First Amendment rights of freedom of the press and free speech apply to all cases based on an injurious falsehood regardless of whether the false statement relates to the plaintiff personally or to plaintiff's property." (3 Levy et al., Cal. Torts, *supra,* Trade Libel, § 40.76[4], p. 40-126.1.) As the California Supreme Court explained it, "[t]he fundamental reason that the various limitations rooted in the First Amendment are applicable to all injurious falsehood claims and not solely to those labeled 'defamation' is plain: although such limitations happen to have arisen in defamation actions, they do not concern matters peculiar to such actions but broadly protect free-expression and free-press values." (*Blatty* v. *New York Times Co., supra,* 42 Cal.3d at p. 1043.) Consequently, all causes of action "hav[ing] as their gravamen the alleged injurious falsehood of a statement . . . must satisfy the requirements of the First Amendment." (*Id.* at p. 1045.)

■ It is indisputable that publications designed to influence government constitute a form of communication protected by the First Amendment. In the words of the United States Supreme Court, "[t]he general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' 'The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.'" (*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 269 [11 L.Ed.2d 686, 700, 84 S.Ct. 710, 95 A.L.R.2d 1412], citations omitted.)

■ Moreover, it has been repeatedly held by the federal high court that the First Amendment generally prohibits prior restraints upon the

---

[8]Shell wisely does not claim that the challenged report constitutes a form of commercial speech, thereby entitling it to less protection under the First Amendment. (See *Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 770-773 [48 L.Ed.2d 346, 363-365, 96 S. Ct. 1817].) The test for identifying commercial speech is whether the publication in question may be said to do no more than "propose a commercial transaction." (*Bd. of Trustees* v. *Fox* (1989) 492 U.S. 469, __ [106 L.Ed.2d 388, 398, 109 S.Ct. 3028]; *Pittsburgh Press Co.* v. *Human Rela. Comm.* (1973) 413 U.S. 376, 385 [37 L.Ed.2d 669, 677, 93 S.Ct. 2553].) The report in this case clearly does not propose a commercial transaction. Moreover, the fact that the report may have economic consequences does not convert it into commercial speech. As the California Supreme Court has observed, "commercial motivation does not transform noncommercial speech into commercial speech." (*Blatty* v. *New York Times Co., supra,* 42 Cal.3d 1033, 1048, fn. 3, citations omitted.)

freedom of speech and of the press.[9] (See, e.g., *Organization for a Better Austin* v. *Keefe* (1971) 402 U.S. 415, 419-420 [29 L.Ed.2d 1, 5-6, 91 S.Ct. 1575]; *Carroll* v. *Princess Anne* (1968) 393 U.S. 175, 181 [21 L.Ed.2d 325, 331, 89 S.Ct. 347]; *Bantam Books, Inc.* v. *Sullivan* (1963) 372 U.S. 58, 70 [9 L.Ed.2d 584, 593, 83 S.Ct.631]; *Near* v. *Minnesota, supra*, 283 U.S. 697, 715-716 [75 L.Ed. 1357, 1367].) In *Near*, the seminal prior restraint decision, the court held that a state statute authorizing an action to enjoin, as a public nuisance, the publication or the circulation of any "malicious, scandalous and defamatory" newspaper or other periodical violated the First Amendment. The high court declared that "it is the chief purpose of the [First Amendment] guaranty to prevent previous restraints upon publication." (283 U.S. at p. 713 [75 L.Ed at p. 1366].) "These principles have retained their vigor from 1931 to date. From *Near* to *Times-Picayune Pub. Corp.* v. *Schulingkamp* (1974) 419 U.S. 1301, 1307 [42 L.Ed.2d 17, 22, 95 S.Ct. 1], it has been consistently held that any prior restraint on expression bears a heavy presumption against its constitutional validity." (*Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 657 [119 Cal.Rptr. 468, 532 P.2d 116].) Underlying the First Amendment's prohibition against prior restraints is the "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open, . . ." (*New York Times Co.* v. *Sullivan, supra*, 376 U.S. at p. 270 [11 L.Ed.2d at p.701].)

In the context of prior restraints and public debate on a matter of public interest, the truth of the statement is irrelevant. "It is elementary, of course, that in a case of this kind [involving an injunction against the distribution of leaflets concerning plaintiff's real estate practices in an urban neighborhood] the courts do not concern themselves with the truth or validity of the publication." (*Organization for a Better Austin* v. *Keefe, supra*, 402 U.S. 415, 418 [29 L.Ed.2d 1, 5, 91 S.Ct. 1575].) This and other cases of the United States Supreme Court "leave no doubt that the truth or falsity of a statement on a public issue is irrelevant to the question whether it should be

[9] Professor Tribe has noted that only rarely has the United States Supreme Court "acknowledged the central feature of prior restraints: the doctrine imposes a special bar on attempts to suppress speech prior to publication, a bar that is distinct from the scope of constitutional protection accorded the material *after* publication. . . . A frequent pitfall of both courts and commentators is to employ the doctrine in cases involving expression clearly within the first amendment guarantees, in ignorance of the fact that '[w]here the speech in question is in all events guaranteed by the First Amendment, attributing that guarantee to the circumstance of prior restraint is at best irrelevant and often misleading.'" (Tribe, American Constitutional Law (2d ed. 1988) Communication & Expression, § 12-34, pp. 1040-1041, italics in original.) Because the right to recover damages for a trade libel was never tendered in this case, we have no occasion to examine whether the dissemination of the CAL report was protected by the First Amendment in all events and thus could not constitute the basis for a monetary recovery of damages for a trade libel. It is sufficient for our purposes to conclude that dissemination of the report and its information could not be enjoined under the circumstances of this case.

repressed in advance of publication. . . . [¶] The concept that a statement on a public issue may be suppressed because it is believed by a court to be untrue is entirely inconsistent with constitutional guarantees and raises the spectre of censorship in a most pernicious form." (*Wilson v. Superior Court, supra,* 13 Cal.3d at pp. 658-659.)

To be sure, the *Wilson* court acknowledged that the decisions recognize prior restraints may be imposed under some extraordinary circumstances. Thus "an injunction restraining speech may issue in some circumstances to protect private rights or to prevent deceptive commercial practices." (13 Cal.3d at p. 662, citations omitted.) ▌ But the underlying dispute between plaintiff and Shell over governmental approval of polybutylene pipe for domestic purposes does not involve private rights between two warring litigants; rather, it is concerned with a public safety and health issue which potentially touches all of the residents of California. Nor does this case involve deceptive commercial practices. Plaintiff is not selling any product, much less a competing pipe or resin. And even if the Council could be said to be a competitor of Shell, itself a doubtful proposition, the Council was not sued and its acts of disseminating the disputed report remain unchallenged.

It cannot be doubted that the public debate over the safety of plastic pipe, then being aired before a branch of state government, constituted a matter of great public interest and concern. There was an ongoing political controversy in California over the unrestricted use of plastic pipe. The Commission was officially considering amendments to state law to permit the use of these pipes and had held a number of public hearings on the question. The Council and plaintiff as its attorney had been active participants at those hearings. Indeed, it was for the purpose of advocating his client's position before the Commission that plaintiff engaged CAL to analyze two pieces of polybutylene pipe. Those tests, as we have recounted, revealed the presence 50 to 500 ppm of the carcinogenic chemical DEHP. Plaintiff presented CAL's findings and report to the Commission and it then decided that polybutylene pipe should be reviewed under the California Environmental Quality Act. In response to this advocacy before the Commission, Shell sought to deflect this regulatory and scientific dispute from the public arena and recast it into a lawsuit in the federal court. Indeed, the very report Shell sought to suppress by injunctive means in its lawsuit was already part of the public record of the Commission and hence was available for inspection and duplication by any interested citizen. Shell's lawsuit was fatally defective because, under the First Amendment, one participant cannot silence the attorney of an opponent in a political controversy by invoking the equitable powers of the federal court. Indeed, Shell's own expert witness, Professor William Cohen of Stanford University, conceded that there is no case that

sanctioned the issuance of an injunction banning the discussion of matters of public concern over health and safety. This is no doubt because in a political controversy over issues of public interest, as Justice Holmes noted, "the ultimate good desired is better reached by free trade in ideas,—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, . . . That at any rate is the theory of our Constitution. . . ." (*Abrams* v. *United States* (1919) 250 U.S. 616, 630 [63 L.Ed. 1173, 1180, 40 S.Ct. 17] (dis. opn. of Holmes, J.).)[10]

We do not mean to suggest that injunctive relief is never available in cases of trade libel. Clearly, it is in the ordinary case involving private disputes. (See, e.g., *System Operations* v. *Scientific Games Dev. Corp.* (3d Cir. 1977) 555 F.2d 1131; *Martin* v. *Reynolds Metals Co., supra,* 224 F.Supp. 978.) But statements made in the context of a public debate before a governmental agency on a matter of public health simply cannot be enjoined no matter what tortious label is pasted upon them. As the Massachusetts high court noted in a comparable context more than 30 years ago, in a case seeking to enjoin the further publication of an allegedly false report unfavorable to plaintiff's special cancer treatment drug, "the great public interest . . . in the untrammelled discussion of cancer cures" constitutionally prohibited the issuance of an injunction. (*Krebiozen Research Foundation* v. *Beacon Press, Inc.* (1956) 334 Mass. 86, 98 [134 N.E.2d 1, 9].) Since an injunction against further dissemination of the report would constitute a prior restraint of publication, its issuance was barred by the First Amendment under the *Near* decision. (*Id.* at p. 96 [134 N.E.2d at p. 6].) The same conclusion is compelled in this case for the same reasons. We conclude therefore that Shell had no probable cause to seek injunctive relief and the trial court correctly found that "[t]he law of the State of California and of the United States does not permit any court to issue an injunction to prevent the dissemination of such a report under the circumstances shown by the evidence in this case."

---

[10] It has been noted that the "marketplace of ideas" theory is not a shibboleth to all First Amendment questions. "This 'marketplace of ideas' argument for freedom of speech may at times serve liberty well, but it relies too dangerously on metaphor for a theory that purports to be more hardheaded than literary. How do we know that the analogy of the market is an apt one? Especially when the wealthy have more access to the most potent media of communication than the poor, how sure can we be that 'free trade in ideas' is likely to generate truth? And what of falsity: is not the right to differ about what *is* 'the truth' subtly endangered by a theory that perceives communication as no more than a system of transactions for vanquishing what is false? What, finally, of speech as an expression of self? As a cry of impulse no less than as a dispassionate contribution to intellectual dialogue?" (Tribe, American Constitutional Law, *supra,* Communication and Expression, § 12-1, p. 786, fns. omitted and italics in original.) Despite the limitations of the "marketplace of ideas" formulation as an all encompassing theory, it is nevertheless clear that under the free speech guaranty the validity and truth of declarations in political disputes over issues of public interest must be resolved by the public and not by a judge.

## C. *Probable Cause to Bring Action for Declaratory Relief*

■ In its federal action Shell also sought a declaratory judgment that "polybutylene resin, and pipe manufactured therefrom, does not contain concentrations of DEHP at levels sufficient to represent a danger to human health, or at 50-500 parts per million, or at all." Plaintiff argues that Shell was inappropriately seeking to establish a scientific truth by the use of a declaratory judgment. We agree. ■ Under the federal Declaratory Judgment Act, with exceptions not relevant here, the federal court, in a case of actual controversy within its jurisdiction, "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." (28 U.S.C. § 2201.) ■ But Shell did not seek a declaration of legal rights; it sought instead a scientific declaration concerning its product. By this mechanism it endeavored to circumvent the very thing that the Commission, in its EIR review, sought to determine, namely whether the pipe or its connectors contained elements which rendered its use unsafe for domestic water use. ■ Under the federal statute, it is settled that "declaratory judgment procedure will not be used to pre-empt and prejudge issues that are committed for initial decision to an administrative body." (*Dawson* v. *Department of Transp.* (W.D.Okla. 1979) 480 F.Supp. 351, 352, citing, inter alia, *Public Serv. Comm'n.* v. *Wycoff Co.* (1952) 344 U.S. 237, 246 [97 L.Ed. 291, 267, 73 S.Ct. 236].) ■ In short, Shell did not seek a declaration of its "rights and other legal relations."

It follows from this that the cause of action for declaratory relief was also untenable and hence lacked probable cause. ■ Given the constitutional constraints necessarily implicated by this political dispute, no reasonable attorney would have thought this action was tenable. Since the trial court properly found that Shell lacked probable cause to bring its lawsuit against plaintiff as a matter of law, we conclude that the instruction to the jury informing them of that determination, even if more detailed than necessary, created no reversible error.[11]

## II

### EXPERT WITNESSES

■ In its next attack on the judgment, Shell argues that the trial court committed reversible error in admitting expert legal testimony on the question of probable cause. At trial plaintiff called three attorneys as expert witnesses.

---

[11] In light of this determination, we have no occasion to consider whether plaintiff's statements were privileged under Civil Code section 47.

Attorney Jermone B. Falk, Jr., who had represented plaintiff in the federal court action, testified among other things that an injunction against speech is almost never permitted in the United States, that plaintiff's actions in the matter were privileged, and that in his opinion there was no legal merit to Shell's action and he considered it frivolous. Two things struck Mr. Falk as extraordinary about the federal complaint: "The first is that the injunction sought was being sought against somebody's lawyer. I don't have any problem with suing lawyers, but to muzzle one I thought was unusual. [¶] And the second thing about it was that it was an injunction against someone speaking, and speaking in a political context." In Mr. Falk's view, political speech is at the heart of the First Amendment and its California counterpart. "That's the way we influence our institutions. And here was a proceeding that was already going on in the government before an administrative agency, [and] this was, this report was being used to persuade that agency of a position. [¶] And to enjoin it, to forbid its use either before that agency or in a related context really struck me [as being] at the heart [of] what the First Amendment is all about." Thus, "once something is a matter of public record, then people can talk about it, have a right to talk about it, comment on it, criticize it, support it, whatever." In his view, it was also unusual to file a lawsuit for an injunction and then not seek a preliminary injunction.

After being retained by plaintiff, Mr. Falk sent a letter to Shell's counsel demanding an unconditional dismissal with prejudice and included citations of authority explaining why he thought dismissal was required by the law. In response, he received an inconclusive letter from opposing counsel who explained that he had "forwarded my letter to Shell Oil, but that it was a large organization and that it would take some time for them to do anything about it." After waiting some two months without a reply, Mr. Falk filed a motion to dismiss. In support of that motion, Mr. Falk filed a memorandum of points and authorities in which he made the same constitutional arguments as he did in his testimony. Shell responded by filing an opposition to the dismissal motion. Then three days before the scheduled hearing on the motion, Shell voluntarily dismissed the action against plaintiff.

Attorney William A. Wilson, who represented CAL in the federal action, testified that he believed the action "had absolutely no merit." "They were trying to enjoin something that was a matter of public record, trying to enjoin dissemination of information in an issue that was being hotly disputed in the public forum." His discussion with Shell's counsel led him to believe that what Shell really wanted "was a statement, they didn't want an injunction, they didn't want a declaratory relief, they didn't want damages. [¶] They wanted some kind of a statement. And at that point we started talking about what kind of a statement and then began working on the

language of the statement, . . ." In short, Shell was "interested in some fashion of getting a statement to neutralize the report." Although Mr. Wilson felt that Shell was applying "economic coercion" against his client, CAL and Shell eventually signed a joint settlement statement and the action was then dismissed with prejudice as to CAL.

■ Finally Attorney Irving H. Perluss, a retired judge whose only connection to the case was as plaintiff's expert, was allowed to testify at length about his views of the law and the merits of the case. He opined that an injunction involving speech can be issued in only the most dire necessity for national security and that product disparagement cannot be enjoined. Since Shell's federal court action did not concern national security, in Perluss's opinion there was no way the complaint could have been amended to state a cause of action. He also offered the opinion that plaintiff's status report was absolutely privileged. When reminded that injunctive relief is available against acts of unfair competition, he insisted that unfair competition laws pertain only to competitors and that there is no way plaintiff could be considered a competitor. He offered the opinion that it was "just outrageous" that plaintiff was sued, and that no reasonable person could say that there was probable cause to sue him.

■ Shell contends the expert testimony is not admissible on the question of probable cause. Shell is correct. Probable cause is a legal question for the court and it is thoroughly established that expert testimony is improper and incompetent on the issue of probable cause. (*Williams* v. *Coombs, supra,* 179 Cal.App.3d at p. 638.) In *Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at pages 874-875, the California Supreme Court recently addressed and adhered to this rule in a malicious prosecution action. "The 'malice' element of the malicious prosecution tort relates to the subjective intent or purpose with which the defendant acted in initiating the prior action, and past cases establish that the defendant's motivation is a question of fact to be determined by the jury. [¶] By contrast, the existence or absence of probable cause has traditionally been viewed as a question of law to be determined by the court, rather than a question of fact for the jury." As the high court went on to explain, "[a]n important policy consideration underlies the common law rule allocating to the court the task of determining whether the prior action was brought with probable cause. The question whether, on a given set of facts, there was probable cause to institute an action requires a sensitive evaluation of legal principles and precedents, a task generally beyond the ken of lay jurors, and courts have recognized that there is a significant danger that jurors may not sufficiently appreciate the distinction between a merely unsuccessful and a legally untenable claim. To avoid improperly deterring individuals from resorting to the courts for the resolution of disputes, the common law affords litigants the assurance that

tort liability will not be imposed for filing a lawsuit unless *a court* subsequently determines that the institution of the action was without probable cause." (*Id.* at p. 875, citations omitted and italics in original.)

▆▆▆ In response to Shell's claim of error in the admission of expert testimony plaintiff inferentially concedes that expert testimony is not admissible on the question of probable cause. Instead, he argues that the testimony of Messrs. Falk and Wilson, as counsel for the parties defendant in the federal lawsuit, was offered for the limited purpose of establishing a favorable termination and the relationship of the CAL settlement to the determination. We agree that the testimony of these attorneys was admissible on the question of favorable termination. "It is apparent 'favorable' termination does not occur merely because a party complained against has prevailed in an underlying action. While the fact he has prevailed is an ingredient of a favorable termination, such termination must further reflect on his innocence of the alleged wrongful conduct. If the termination does not relate to the merits—reflecting on neither innocence of nor responsibility for the alleged misconduct—the termination is not favorable in the sense it would support a subsequent action for malicious prosecution." (*Lackner* v. *LaCroix* (1979) 25 Cal.3d 747, 751 [159 Cal.Rptr. 693, 602 P.2d 393].) It has been correctly noted that a voluntary dismissal may have been prompted by factors other than the merits of the lawsuit. ▆▆▆ "Although voluntary dismissal of the underlying action is usually considered a favorable termination of the action for purposes of a malicious prosecution action, the failure to prosecute may occasionally be attributable to other than a complainant's implicit concession as to the merits of the action. Where the evidence conflicts as to the real motive for the voluntary dismissal of the underlying action, the question of favorable termination is to be resolved by the jury." (6 Cal.Jur.3d, Assault and Other Wilful Torts, § 345, pp. 878-879, fn. omitted; see *Weaver* v. *Superior Court* (1979) 95 Cal.App.3d 166, 184-185 [156 Cal.Rptr. 745]; *Minasian* v. *Sapse* (1978) 80 Cal.App.3d 823, 826-828 [145 Cal.Rptr. 829]; see also BAJI No. 7.32.5.) ▆▆▆ Such was the case here. Shell denied that its voluntary dismissal was prompted by its assessment of the merits of the federal action and consequently its motive became a factual issue to be resolved by the jury. Thus the jury was instructed that favorable termination meant "that the termination was of such a nature as to indicate the freedom from liability of [plaintiff] in the prior federal civil proceeding. [¶] It is for you to decide, under all the circumstances of the evidence, whether dismissal of the prior federal suit by [Shell] against [plaintiff], reflected a lack of merit of said prior federal suit." Consequently, plaintiff was entitled to establish the circumstances surrounding the dismissal. Those circumstances included opposing counsel's assessment of the constitutional impediment to the federal lawsuit and his motion for dismissal based upon that assessment. The inference to be drawn from this

testimony is that Shell's dismissal reflected a realization that its suit lacked merit and was untenable.

 Shell asserts the testimony of Mr. Perluss poses a different problem. Shell says Mr. Perluss had no connection with the federal case and was not a percipient witness to any of the events that led to the dismissal of that action. He did, of course, read the pleadings and the motions of the parties in the federal suit. Nevertheless, the gist of his testimony related not to the favorable termination question but rather to the propriety of filing the lawsuit in the first place. Consequently, it is fair to say that he was called as an expert to testify on the law.

Plaintiff argues that Mr. Perluss's testimony was admissible on the reprehensibility of Shell's conduct in determining punitive damages. In his brief plaintiff argues that "[a] determination of lack of probable cause by the court does not tell a jury that the conduct is outrageous; it merely tells them that it is not permitted under the law. There is a world of difference between conduct that falls below an objective standard and conduct that is so reprehensible to be beyond the pale of what any rational corporation with a huge legal staff could even imagine to be acceptable since the establishment of our Republic upon the North American continent 200 years ago." We need not resolve this contention because Shell waived any error in the admission of Mr. Perluss's testimony by failing to object to it. The Evidence Code provides that a verdict or judgment shall not be set aside by reason of the erroneous admission of evidence unless there "appears of record an objection to or motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; . . ." (Evid. Code, § 353, subd. (a); see also Evid. Code, § 803.) In light of this section, questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection. (*People* v. *Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal.Rptr. 732, 579 P.2d 1048].) Thus, Shell waived any claim of error in the admission of expert testimony by Mr. Perluss by failing to object to his testimony. (*Gaehwiler* v. *Occupational Safety & Health Appeals Bd.* (1983) 141 Cal.App.3d 1041, 1046 [191 Cal.Rptr. 336].)

Shell counters that it repeatedly objected to Mr. Falk's legal opinion testimony and that objection was persistently overruled. It argues that once a party's objections to a line of questioning have been asserted and overruled, it not necessary to continue to interrupt the taking of testimony in order to preserve appellate rights. (See 3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 2022, p. 1984.) But that rule has no application here. The testimony of Mr. Falk was offered for the limited purpose of establishing a favorable termination of the federal lawsuit and

the jury was accordingly instructed on evidence admitted for a limited purpose. But the testimony of Mr. Perluss was not offered for a limited purpose or on the question of favorable termination. As Shell now characterizes it, that testimony was offered on the question of probable cause. The sweep of the continuing objection rule does not encompass the testimony of different witnesses offered for different purposes. (*People* v. *Epps* (1981) 122 Cal.App.3d 691, 704 [176 Cal.Rptr. 332].) By failing to object, Shell waived any error.

## III, IV*

. . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Blease, Acting P. J., and Sims, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 29, 1990. Lucas, C. J., Panelli, J., and Eagleson, J., were of the opinion that the petition should be granted.

---

*See footnote, *ante,* page, 547.